*In re* MITCHELL'S ESTATE.

McNALL *v.* MITCHELL'S ESTATE.

1. EXECUTORS AND ADMINISTRATORS — ESTATES OF DECEDENTS—
   CLAIMS—CONTRACTS—WORK AND SERVICES.
   Evidence that the claimant made loans for decedent in
   the lifetime of the latter, who stated, in the presence of
   claimant's brother, that he would pay claimant hand-
   somely for the services when he died, and would com-
   pensate claimant more than any percentage would
   amount to, tended to sustain a finding of the trial court
   that there was a contract to pay the claimant for his
   services.

2. APPEAL AND ERROR—TRIAL—VERDICT—FINDINGS OF FACT.
   Findings made by the trial court sitting without a jury
   are regarded as special verdicts, and, if there is, testi-
   mony to support them, are conclusive, on error, but if it
   is claimed that there is no testimony to sustain them or
   any thereof, the Supreme Court will examine the testi-
   mony returned.

3. ESTATES OF DECEDENTS—CONTRACTS—VALUE.
   Upon testimony that there was an agreement to pay for
   services rendered to decedent and that they were after-
   wards rendered, also showing what they were worth,
   the trial court was warranted in entering a judgment
   for their value and this court will not review the testi-
   mony to ascertain that the amount awarded is sufficient
   or excessive.

Error to Gratiot; Searl, J. Submitted November
25, 1913. (Docket No. 142.) Decided January 5,
1914.

The claim of B. Frank McNall against the estate
of Uriah H. Mitchell, deceased, was allowed in part
by the probate court. Edward Sweeney, executor,
appealed to the circuit court. Judgment for claim-
ant. Defendant brings error. Affirmed.

*S. Wallace Dempsey* and *O. G. Tuttle,* for appellant.

*George P. Stone* and *M. R. Salter,* for appellee.

KUHN, J.  The claimant presented a claim in the probate court of Gratiot county against the defendant, which was as follows:

"Estate of Uriah H. Mitchell, To B. Frank McNall, Dr.

"To services in loaning money for said Uriah H. Mitchell, looking up the value and title of lands on which it was loaned, taking and having the care of said money till it was loaned, collecting the interest on said loans and remitting same to said Uriah H. Mitchell, from A. D. 1884, until the death of said Uriah H. Mitchell, $2,000."

The claim was tried before the probate judge, who allowed it at the sum of $993.64. An appeal being taken to the circuit court by the executor of the last will and testament of the deceased, the case was tried before the circuit judge without a jury, who allowed the claim at the sum of $2,000 and made the following findings of facts and law:

"*First.* That deceased in his lifetime and during the year 1887 made a contract and agreement to and with the claimant whereby the claimant should, as the agent of the deceased, receive money from deceased and loan the same out in Gratiot county, Mich., upon real estate security, and that the deceased in consideration thereof would, after his (deceased) death, pay the claimant handsomely for such services, a great deal more than any percentage would amount to, a great many times more than any percentage would be.

"*Second.* I further find that the claimant under this agreement entered upon such employment during the year 1888 and loaned money for the deceased, furnished him by deceased during each of the years 1888, 1890, 1892, 1893, 1894, 1895, 1896, 1898, 1902, 1903, 1905, 1906, 1907, 1908, and 1909.

"*Third.* I further find that during these years the claimant loaned out a gross sum of $39,747, from

which loans the deceased received as interest earned thereon the sum of $13,615.59. That in some instances the interest was remitted direct by the mortgagors to Mitchell, and in some instances it was paid to the claimant, and by him remitted to Mitchell or to the bank where Mitchell kept his deposits, and through which he did business. But the evidence does not show what amounts were so remitted direct or how much was remitted by claimant.

"*Fourth.* That deceased died on the 17th day of May, 1910, leaving as his heirs and next of kin nephews, nieces, and a sister-in-law, and leaving a last will and testament by which he bequeathed and devised his estate to his nehpews, nieces, and sister-in-law, excepting $1,000, which he bequeathed to claimant's only son.

"*Fifth.* I further find from the evidence that, under said agreement aforesaid between the deceased and the claimant, the claimant is entitled to receive for such services in loaning such money, and as a reasonable compensation therefor, a commission of one-tenth of the interest earned, where the loan was at 5 per cent., and one-twelfth where the interest was 6 per cent., and in addition thereto such a sum of money as is equal to the interest at 5 per cent. on the commission on each year's business from the end of the year up to the time of the death of the deceased.

"I also find that the claimant is entitled to receive interest at 5 per cent. on the amount owing to him, at the time of the death of the deceased, from the time of the death of the deceased to the present time.

"*Sixth.* I find from the evidence of the amounts loaned during each year and the interest earned on such loans, and computing interest on such amounts as aforesaid, that the gross amount of such commission and interest thereon is in excess of the sum of $2,000.

"*Seventh.* I further find that the claim of the claimant, as presented in probate court, was for the sum of $2,000, and, this appeal from probate court having been heard upon the claim as so presented in that court, that the claimant cannot have in this court any greater amount than the amount of said claim as so presented in probate court.

"*Eighth.* Therefore this court does hereby find,

adjudge, and order that the claim of the claimant is a just and proper claim against the above estate for the sum of $2,000, and the same is hereby allowed against said estate at the sum of $2,000.

"*Ninth.* The court further finds and adjudges that the claimant do recover his costs in this court to be taxed as in an original suit brought in this court."

The case is brought here by writ of error, and appellant sets forth in the record 21 assignments of error, the first 12 of which are abandoned in this court. The principal claim urged by appellant is that the court erred in finding that the deceased made a contract with the claimant in 1887; it being contended that there are no facts in the case which support this finding. The claimant, who was a cousin of the deceased, is a farmer and has resided in Gratiot county since 1881. Before that time he resided in Niagara county, N. Y., about one-half mile from the home of the deceased, who resided there at the time of his death. Claimant loaned money for the deceased, from the year 1887, on property in claimant's neighborhood, at 1 per cent. below the prevailing rate. It is undisputed that he did not receive any commissions from the borrowers. In support of his contention, claimant produced James H. McNall, his brother, upon whose testimony reliance is placed to support the contract. He testified as follows:

"While I lived in Michigan, prior to 1903, I went back to New York frequently. I remember being there to attend my daughter's wedding, in 1887. My brother was there also. I then saw and visited Uriah Mitchell. At that time my brother and I were at his place together a great many times. On one of these occasions, something was said about the claimant loaning money for Mitchell. There were present, at that time, my brother, Mitchell, his sister, and I. Mitchell said, 'Boys, what are the chances, what would be the chances of making good, safe loans in Gratiot county?' My brother said he thought that they would be all right and safe if a man was care-

ful and got a good abstract of title and so forth. Mitchell said if he had any places for it he would send my brother some money to loan. My brother told him he would loan it for him. Mitchell said, 'If you do any business, make any loans, I do not expect Frank to pay you a percentage on these loans but will pay you "handsomely," a great deal more than any percentage would amount to;' that he would pay him at the time of his decease or when he got through doing business in this world; I think those were exactly his words. * * * Some time previous to Mitchell's death, in the latter or middle part of December, 1909, my brother and I were in New York again. Mitchell died on the succeeding May. I was then living in New York, about 6 miles from Mitchell. From 1903 to the time of his death I visited Mitchell frequently, sometimes once a week, sometimes once in two weeks, and sometimes perhaps twice a week. When my brother came down in December, 1909, he came to my place. He and I went over to Mitchell's. While we were there, there was some conversation in respect to what Mitchell would do for my brother or what he would give him. There were present, at that conversation, my brother, Mitchell, and I. It was at Mitchell's house. My brother spoke of a five-year mortgage given by one Simmons, who had sold his farm and wanted to pay the mortgage. He did not know whether Mitchell wanted the money or not. I said to Mitchell: 'Frank has been at work for you a long time. Why not give him this $2,000 for what he has worked for you, up to the present time?' 'He needs it and it will help him a good deal more than it will at your death.' Mitchell said he calculated to pay my brother handsomely (he used the word 'handsomely' again) for all he had ever done for him and what he wanted him to do hereafter; that he was getting to be an old man and he wanted somebody to look after his business. * * * He used an expression of a drop in the bucket, saying, 'this $2,000 won't be a drop in the bucket of what I expect to pay Frank for his services.' I think Frank came Sunday morning, on that visit, and went home the same week. After this time I visited Mitchell frequently, very frequently, but I can't tell just how often. I had

178 MICH.—32.

some conversation with him, after that time, about Frank, but I would not want to swear positively as to the date it occurred, because I was over there so many times, and the same matter was talked over on two or three different occasions."

We would not review this testimony if it were not for the claim that there is no evidence to support the contract found to have been made by the circuit judge.

As we said in *Wood* v. *Rooks,* 173 Mich. 270, 275 (139 N. W. 35):

"In cases like this, the findings of fact are regarded as special verdicts, and, if there is testimony to support them, are conclusive in this court. If it is claimed there is no testimony tending to sustain them, or any of them, this court will examine the testimony if it, or the substance of it, is returned."

Can it be said that the testimony of the brother was so indefinite and uncertain as to make the alleged contract void on that account? It is the claim of the claimant that there was an express contract to pay for services and that from this contract an implied promise arose, taken together with the fact that the services were rendered, to pay their reasonable worth and value, and in support of this position the case of *In re McNamara's Estate,* 148 Mich. 346 (111 N. W. 1066), is relied upon. In that case the agreement was to pay claimant "'liberally for all her services,' * * * and that such allowance payment would be sufficient to keep claimant well during the balance of her life." The court held that, "the evidence of the contract being wholly oral, it was properly left to the jury to determine whether such contract was for full compensation in any event, together with a further assurance that such compensation would be sufficient in amount for claimant's future support, or whether it was intended that claimant was to be limited to a sum adequate for such support, although her services

may have been worth more;" and that, "if the special contract was found by the jury to be a contract for full compensation out of decedent's estate, it would follow that the actual value of such services was the measure, and that evidence of value was admissible."

In the instant case the language was: "Handsomely and more than any percentage would amount to." The agreement as claimed is certain that claimant was to receive compensation at decedent's death, and the only element uncertain was the amount of compensation.

In our opinion, under the facts, there being evidence of an agreement to pay for the services, it became a question of fact as to what compensation was reasonable and adequate in view of the terms of the contract and what was done by the parties under and by virtue of it. Claimant showed by a witness, J. L. Potts, a money lender, that a reasonable compensation and value of claimant's services in loaning money was one-twelfth of the interest earned at 6 per cent. and one-tenth when it was 5 per cent.

In the case of *In re Gibson's Estate,* 163 Mich. 502 (128 N. W. 738), cited by appellant, there was no evidence that claimant ever performed any services for the decedent after the claimed statements as to compensation were made, or that the decedent agreed to pay claimant in money or property out of his estate after his death, which is clearly distinguishable from the case before us. The instant case is also distinguishable from *In re Van Dyke's Estate,* 171 Mich. 195 (137 N. W. 79), because in that case claimant was not seeking to recover what his services were worth.

As we are satisfied that there is testimony to support the findings of fact of the trial judge as to contract and value of the services, and that the amount awarded is not in excess of what is substantiated by proof, we must decline to go into the testimony to

ascertain whether or not we would reach the same result upon the facts. *Cragin* v. *Gardner*, 64 Mich. 399 (31 N. W. 206); *Lamoreaux* v. *Creveling*, 103 Mich. 501 (61 N. W. 783); *Hindman* v. *Friedrich*, 163 Mich. 655 (128 N. W. 1086); *Holcomb* v. *Sayers*, 173 Mich. 238 (138 N. W. 1043).

Judgment is affirmed.

MCALVAY, C. J., and BROOKE, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.